# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MAVIS COES,**

    **Plaintiff,**

**-vs-**             **Case No.  6:05-cv-563-Orl-DAB**

**WORLD WIDE REVIVAL, INC., d/b/a:**
**World Wide Express Bus Co.,  and BISHOP**
**L. WILLIAMS,**

    **Defendants.**

_____

## MEMORANDUM OF DECISION

   This cause came on for trial on February 1, 2007.  For the reasons set forth below, the Court

renders a verdict in the amount of $47,792 in favor of Plaintiff Mavis Coes, and against Defendants

World Wide Revival, Inc. d/b/a World Wide Express Bus Co. and Bishop L. Williams, jointly and

severally.

## PROCEDURAL HISTORY

   This case was originally assigned to the Honorable Anne C. Conway, United States District

Judge, and the Honorable Karla R. Spaulding, United States Magistrate Judge.  On December 15,

2006, while the case was still assigned to Judge Spaulding, in the "Joint Request for Bench Trial,"the

Plaintiff and Defendants "stipulate[d] to a Non-Jury Bench Trial before a Magistrate."  Docket No.

49.  In her Order of Reference, Judge Conway referred this case "to the assigned United States

Magistrate Judge, for all further proceedings and the entry of judgment in accordance with 28 U.S.C.

§ 636(c) and Fed. R. Civ. P. 73, with any appeal to be taken to the United States Court of Appeals."

Docket No. 51 at 1.  This case was reassigned to the late Honorable James G. Glazebrook on January

22, 2007 and on February 1, 2007, the day of the bench trial before Judge Glazebrook, all parties again consented to a bench trial before the United States Magistrate Judge[1].  Doc. No. 63, 67.

Judge Glazebrook unexpectedly passed away on May 3, 2007 and the case was subsequently reassigned to this Court.  Pursuant to Federal Rule of Civil Procedure 63:

> If a trial or hearing has been commenced and the judge is unable to proceed, any other judge may proceed with it upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties. In a hearing or trial without a jury, the successor judge shall at the request of a party recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

FED. R. CIV. P. 63; *see also Jackson v. State of Ala. State Tenure Comm.*,  405 F. 3d 1276 (11th Cir. 2005) (noting that rule gives parties the right to insist that a witness be recalled in a bench trial).  At a status conference on May 17, 2007, the parties agreed to have the previous trial reviewed and ruled on by this Court.  Doc. No. 66.  The undersigned certifies his familiarity with the record and determines that the case may be completed without prejudice to the parties.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

At trial, Coes offered her testimony and Williams' testimony.  Williams also testified on behalf of Defendants.  Based on the testimony of Coes and Williams and the exhibits admitted into evidence, the Court's makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

---

[1]Reference to a magistrate judge under 28 U.S.C. § 636(c), can be withdrawn by the court only "for good cause shown on its own motion, or under extraordinary circumstances shown by any party."  *See* 28 U.S.C. § 636(c)(6); *Dixon v. Ylst*, 990 F.2d 478, 480 (9th Cir. 1993); *Hatcher v. Consol. City of Indianapolis*, 323 F.3d 513, 516 (7th Cir. 2003); *Fellman v. Fireman's Fund Ins. Co.*, 735 F.2d 55, 58 (2d Cir.1984).

## I.      FINDINGS OF FACT[2]

In 1969, Williams[3] established a church which he incorporated as the World Wide Revival, Inc. ("World Wide Revival"), with its principal place of business in Eatonville, Florida.  R. 81. Williams is an officer, director, and president of World Wide Revival, Inc.  R. 118.  Around the same time, World Wide Revival, Inc., began doing business as World Wide Express Bus Company ("World Wide Express").  R. 86. World Wide Express provides bus transportation to customers, mostly local schools that need transportation for field trips.  R. 32. World Wide Express used two buses, which each held forty-seven passengers, but one bus was ruined in a fire.  R. 89.  World Wide Express sometimes leased buses from other bus companies to transport large numbers of passengers. R. 90. At one point, World Wide Express leased twenty buses for two days.  Pl Ex. 3; R. 43-44.

In January 2001, Coes met Williams when she hired World Wide Express to transport her sister's women's group from the Orlando area to Gainesville, Florida.  R. 23.  Three months later, in March 2001,Williams invited Coes to join his World Wide Revival church, and Coes accepted his invitation. R. 25. Williams cannot read but he can write.  R. 80.

Around December 2001, Williams asked Coes to work for him and promised to pay her.  R. 26, 27, 30.  Coes did not ask how much she would be paid, but she asked Williams to agree in writing to pay her.  R. 26.  Williams assured Coes that he would pay her; that he had the money to pay her; and that they did not need a written agreement.  R. 26, 48. Coes did not insist on a written agreement because World Wide Revival was her church, she was not as "pushy" about the written agreement as she ordinarily would be.  R. 26, 48.  Plaintiff would find out where customers wanted to go, obtain

---

[2]The Findings of Fact are taken from the Transcript of the trial held on February 1, 2007.  *See* Doc. No. 67.  Citations to the Transcript will be cited as "R. __."

[3]Williams' name is Laurel Williams, and he is known as Bishop L. Williams, a title he gave himself through his church.

the price from Williams, and send them out a contract using the mail and fax.  R. 31, 99.  Contacts would come two to three times per week from out of state; Plaintiff would have to talk to contacts out of state to make hotel arrangements.  R. 33.  Most of the time the buses were hired by local schools going to various cities and towns in Florida, but buses were also hired to go to places out of state, such as Mississippi or New York.  R. 32-33.  Plaintiff originally used a contract she wrote and later used one that Williams gave her.  R. 31-32.

On December 31, 2001, Coes started working for Williams and World Wide Express.  R. 30. World Wide Express was not busy at that time, and Williams began by giving Coes small tasks.  R. 31.  Coes testified that she worked from 7:00 or 7:30 a.m. until 7:30 or 9:00 p.m. each day, and occasionally until midnight.  R. 53-54.  Coes worked from her home, using a fax machine that she supplied, and she paid the phone bill.  R. 54-55, 78, 99.  She did not keep time records.  R. 55.  She states that she kept a diary of the hours she worked in 2001, but she did not submit this diary at trial. R. 69-70.

During a typical day, Williams called Coes at 8:00 p.m. and played the messages he had received during the day.  R. 56.  Coes would take breaks if friends came by, but she considered herself "on call" for the bus company.  R. 75.  She answered messages, sent contracts, and solicited work and jobs from other companies; she also sent thank you letters.  R. 56.  Additionally, she did work related to Williams' rental properties.  R. 58.  Coes testified that the company provided five to six trips per week.  R. 60.  Williams testified that he only asked her to handle two to three World Wide Express calls (and the follow-up faxing) per month; and that a good part of the time they were on the phone they were discussing scriptures and the church.  R. 111-12.  Coes states that she worked sixty hours a week, the same schedule in February 2003 through December 2004.  R. 62, 69.

-4-

During that time, Williams often told Coes that he would pay her for her work, but he did not. Because Williams did not pay her, Coes went to the AARP for help finding part-time work to supplement her income around April 2002.  R. 45.  Florida Department of Children and Families ["DCF"] hired Coes, and she worked part-time for DCF from April 2002 through February 2003.  R. 45-46.  Coes worked for DCF for four hours per day, five days per week, for a total of twenty hours per week.  R. 46.

While working for DCF, Coes testified that she continued working for Williams and World Wide Express. R. 47.  She testified that she continued working forty to forty-five hours per week for World Wide Express and sometimes worked on weekends.  R. 47.  In February 2003, Coes testified that she left DCF because Williams promised that if she worked full-time for World Wide Express, he would pay her $500 per month.  R. 47.  Williams testified that Coes wanted to work from home for him instead of DCF so she could care for her granddaughter in her home.  R. 114, 130.

Over the time she worked for World Wide Express, Williams paid Coes a small amount of wages, *i.e.*, $200 as wages[4] four or five times, but the other checks that she received were reimbursements.  R. 38.  On March 26, 2002, she received $100 for an airport bus training session. R. 36.  On May 22, 2003, Williams wrote her a $520 check towards repayment of $7,500 worth of bus insurance.  R. 37, 117.  Williams testified without any specificity that he gave Coes "money all the time."  R. 113.

In June or July 2003, Coes and Williams agreed that Williams would convert her two-car garage into a cottage where her son and granddaughter could live, in return for a year of Plaintiff's work. R. 49, 107, 114. Williams had previously built an office in Coes' garage between 2001 and

---

[4]Plaintiff also testified that Williams wrote her a $300 check for wages, but the check was not in evidence.  R. 48.

2002, for which she had paid him.  R. 77.  Unfortunately, Williams did not finish the conversion project because he was not willing to put in a kitchen that he believed would not pass the building inspection. R. 49, 115.  Plaintiff paid other individuals a total of $7,300 to finish the walls, plumbing, and electrical work that Williams was supposed to perform under the agreement.  R. 50-52.

Williams and World Wide Revival never provided Coes with W-2 forms or 1099 forms for the Internal Revenue Service; Williams never contacted the Department of Labor to see if he was in compliance with the Fair Labor Standards Act.  R. 78.  Coes never took any deductions on her tax returns for any business-related expenses or charitable contributions.  R. 78.  World Wide Revival had never "hired" any employees, however, the church secretary received a discount on her rent in exchange for the services provided.  R. 82-85.  World Wide Express' gross income was approximately $20,000 to $30,000 per year.  R. 122-24.  Income from World Wide Express and Williams' rental properties went into the bank account for World Wide Revival.  R. 90-91, 104.

## II.     THE LAW

### A.     Fair Labor Standards Act

Plaintiff seeks to hold Defendants liable for violation of the minimum wage and overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206(a), 207(a) ("FLSA").[5]  The federal minimum wage at the time at issue was $5.15 per hour.  29 U.S.C. § 206(a).  Also, an employer must pay one and one-half times the employee's regular rate for all hours worked in excess of forty hours per work week.  29 U.S.C. § 207(a).  Plaintiff bears the burden of proving by a preponderance of the evidence: 1) the existence of an employment relationship; 2) that she was an employee engaged in

---

[5] 29 U.S.C. § 206(a)(1) provides that "[e]very employer shall pay to each of his employees who . . . is engaged in commerce or in the production of goods for commerce . . . [the minimum wage]."  29 U.S.C. § 207(a)(1) states that "no employer shall employ any of his employees who . . . is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours unless such employee received compensation . . . at a rate no less than one and one-half times the regular rate."

commerce or employed by an "enterprise" engaged in commerce; 3) that Defendants failed to pay her the minimum wage and overtime required by the FLSA; and 4) she is owed the amount claimed by a just and reasonable inference. *See* 29 U.S.C. §§ 206(a), 207(a); *see also* ELEVENTH CIRCUIT PATTERN JURY INSTRUCTIONS (CIVIL CASES) (2005) at 143-46.

### B.    The Employment Relationship

Defendants argue that they did not hire or employ Plaintiff, but rather, Plaintiff volunteered her services as a member of Williams' church.  The FLSA provides very general definitions for "employer" and "employee."  It defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee" and an "employee" as "any individual employed by an employer."  29 U.S.C. §§ 203(d), 203(e)(1).  To "employ" is defined expansively as to "suffer or permit to work." 29 U.S.C. § 203(g).  The FLSA does not define "work."  29 C.F.R. § 785.6.

### 1.    The "Economic Reality" Test for Employment

The United States Supreme Court has held that in determining whether an employment relationship exists pursuant to the FLSA, courts must look at the "economic reality" of the relationship between the alleged employer and employee.  *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) (stating that the "economic reality," not "technical concepts" are the "test of employment").  What the parties themselves label the relationship is not determinative.  *See Tony and Susan Alamo Foundation v. Sec'y of Labor*, 471 U.S. 290, 295 (1985); *Goldberg*, 366 U.S. at 33; *Rutherford Food Corp. v. McComb*, 331 U.S. 728, 729 (1947).  The "determination of the [employment] relationship does not depend on . . . isolated factors but rather on the circumstances of the whole activity." *Rutherford Food*, 331 U.S. at 730.

The United States Supreme Court has defined "work or employment" as activity that was 1) "controlled or required by the employer," and 2) "pursued necessarily and primarily for the benefit of the employer and his business." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 693 (1946) (superceded in aspects not relevant to this case by the Portal to Portal Act, 29 U.S.C. § 251-262); *Tennessee Coal, Iron & R. Co. v. Muscoda L. No. 123*, 321 U.S. 590, 598 (1944)[6] (same); 29 C.F.R. § 785.7 (citing both the *Anderson* and the *Tennessee Coal* cases).[7]   An individual is *not* employed (within the meaning of the FLSA) where the individual works only for her own benefit.   In other words, as stated by the Supreme Court, an employment relationship does not exist where the alleged employee works "without promise or expectation of compensation, but solely for his personal purpose or pleasure." *Tony and Susan Alamo Found. v Secretary of Labor*, 471 U.S. 290, 295 (1985); *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947).[8]

───────────────

[6]In *Tennessee Coal*, the United States Supreme Court defined "work or employment" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Tennessee Coal Iron & R. Co. ,* 321 U.S. at 598.  The Supreme Court subsequently held that physical or mental exertion was not required, and that "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944) (discussed below).

[7]After the FLSA was first enacted in 1938, the United States Supreme Court issued opinions in several cases in which it expounded on the definition of "work" and the types of "work" activity that are compensable within the meaning of the FLSA.  *See Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947); *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680 (1946); *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161 (1945); *Armour & Co. v. Wantock*, 323 U.S. 126 (1944); *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944).  In all of these cases, an employment relationship already existed, and the Supreme Court was tasked with determining whether certain types of uncompensated activity performed by the employee (such as the time spent walking to the employee work station) was considered "work" or "employ[ment]" that is compensable under the FLSA.  In contrast, in the case now before the Court, World Wide Express and Williams principally claim that no employment relationship existed at all.  Nonetheless, the cases are on point because the FLSA defines an "employee" as "employed by an employer" and "employ" as to "suffer or permit to work."  29 U.S.C. §§ 203(e)(1), 203(g).  Therefore, under the statute, time that is not spent "working" is time during which an individual is not "employed" within the meaning of the FLSA.

[8]The Supreme Court also explained that in the FLSA, "[t]he definition 'suffer or permit to work' was obviously not intended to stamp all persons as employees who, without any expressed or implied compensation agreement, might work for their own advantage on the premises of another." *Portland Terminal Co.*, 330 U.S. at 152.  In that case, it was undisputed that the alleged employer received "no immediate advantage from any work done by the [alleged employees]." *Id.* at 153.

Nevertheless, an employment relationship may exist for the purposes of the FLSA even when the employees consider themselves "volunteers" who work for religious reasons.[9] *See Tony and Susan Alamo Found.*, 471 U.S. at 302.  In *Tony and Susan Alamo Foundation*, the Supreme Court held that an employment relationship existed between a non-profit religious organization which derived its income from the operation of commercial businesses and "associates" who worked at these various businesses. *Id.* at 300-02.  The non-profit organization provided benefits (such as food, clothing, and shelter) but not money to its "associates." *Id.* at 292.  The "associates" testified at trial that they expected no compensation for their services, and rather, considered their work to be part of their ministerial activities. *Id.*  In considering the "economic realities" of the circumstances, the Supreme Court found it relevant that the associates were "entirely dependent upon the [employer] for long periods, in some cases several years"; and that although the associates did not expect compensation in the form of wages, they did expect the employer to provide them other "in-kind benefits" in exchange for their work. *Id.* at 301.

Furthermore, an employment relationship may exist if the alleged employer permits an individual to work for the employer, although the employer had not expressly hired that individual. *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768, 770 (5th Cir. 1945).  A compensation agreement between an employer and an employee may be "express" or "implied." *Portland Terminal Co.*, 330 U.S. at 152.

2.    *Activities that Constitute Work*

In this case, Coes worked from her home, and performed different tasks, depending on what was needed.  She thus spent *part* of her time receiving and initiating phone calls, faxing documents,

---

[9]This makes sense because what the parties themselves label the relationship is not determinative, and rather, the Court evaluates the relationship based on the "economic reality" of the situation (as discussed above).

and generally making other arrangements on behalf of Williams and World Wide Express.  She spent the rest of her time either waiting for Williams to give her tasks or performing personal tasks unrelated to Defendants, such as providing childcare for her granddaughter.  The Court must therefore determine whether Coes proved, as part of her case-in-chief, that she was employed by Defendants for *all* of the relevant time claimed, including the time spent waiting or on personal activities.[10]

Time spent waiting – whether by being idle or performing personal tasks – may be "work" within the meaning of the FLSA, depending on the circumstances.[11]  The principal inquiry for the Court is whether the employment agreement (either express or implied) contemplated waiting time as compensable "work."  *See Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944);  *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).  The *Skidmore* case is particularly instructive on what courts should consider:

> We [the United States Supreme Court] have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time.  Whether in a concrete case such time falls within or without the [FLSA] is a question of fact to be resolved by appropriate findings of the trial court.  *This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances.  Facts may show that the employee was engaged to wait, or they may show that he waited to be engaged.  His*

---

[10] The question of whether Plaintiff was performing "work" within the meaning of the FLSA is different, but related, to whether Plaintiff proves damages owed by a just and reasonable inference.  For example, the Court might find that Plaintiff's waiting time was "work" within the meaning of the FLSA, but that she did not work the number of hours she claims.

[11] The Supreme Court has explained:

> Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen.  Refraining from other activity is often a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity.  Readiness to serve may be hired, quite as much as service itself . . . . *Whether time spent is predominately for the employer's benefit or for the employee's is a question dependent on all the circumstances of the case.*

*Armour & Co.*, 323 U.S. at 133 (emphasis added).

> *compensation may cover both waiting and task, or only performance of the task itself.*
> Living quarters may in some situations be furnished as a facility of the task and in
> another as part of its compensation.  The law does not impose an arrangement upon
> the parties.  It imposes upon the courts the task of finding what the arrangement was.

*Skidmore*, 323 U.S. at 137 (emphasis added; citation omitted).  Further, the Court must evaluate such

arrangements "in accordance with common sense and the general concept of work or employment."

29 C.F.R. § 785.14.

Case law and the Code of Federal Regulations also frame the inquiry in terms of whether an

employee is "on duty" or "off duty."  For instance, according to the Supreme Court, a "workweek"

under the FLSA ordinarily includes "all time during which an employee is *necessarily required to be*

on the employer's premises, *on duty* or at a prescribed work place."  *Anderson*, 328 U.S. at 690-91

(emphasis added)[12]; *see also* 29 C.F.R. §§ 785.15, 785.16.

Of course, an employee who works from home is not working *all* of the time they are at home.

*See* 29 C.F.R. § 785.23.  Rather, employees are working for a period of time when they are "unable

to use the time effectively for [their] own purposes."  29 C.F.R. § 785.15.  This time "belongs to and

is controlled by the employer . . . [and] waiting is an integral part of the job."  *Id.*[13]  In contrast,

"[p]eriods during which an employee is completely relieved from duty and which are long enough to

enable him to use the time effectively for his own purposes are not hours worked" within the meaning

of the FLSA.  29 C.F.R. § 785.16.  An employee "cannot use the time effectively for his own purposes

------

[12]  The Portal-to-Portal Act, 29 U.S.C. §§ 251-62, subsequently excluded from FLSA "working time" all "preliminary" and "postliminary" activities, but did not alter the basic rule articulated in the *Anderson* case.  *See* 29 C.F.R. §§ 785.7, 785.9.

[13] The employee may be allowed to leave the premises during these waiting periods.  The waiting periods, however, are generally short and occur at unpredictable times – such as with a stenographer who reads a book while waiting for dictation, or a messenger who completes a crossword puzzle while waiting for an assignment.  29 C.F.R. § 785.15.

unless he is told in advance that he may leave the job and that he will not have to commence work until a definitely specified hour has arrived." *Id.* The regulations further provide:

> Ordinarily, [an employee who works at home] may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.

29 C.F.R. § 785.23. "On call" employees are not "working" during a period of time when they: 1) may leave their employment premises, and 2) are only required to alert their employers where they may be reached during that period. 29 C.F.R. § 785.17. Short "rest" periods are counted as time worked, but "bona fide meal periods" of thirty minutes or more are not considered work. 29 C.F.R. §§ 785.18, 785.19.

3.     *Employers*

Coes seeks to hold World Wide Express and Williams personally liable as her "employers" under the FLSA. She therefore bears the burden of proving the employment relationship as to both Defendants. The Eleventh Circuit explained that in applying the "economic reality test" to determine whether a particular defendant was an "employer" within the meaning of the FLSA, the Court may look at several factors, including whether the alleged employer: 1) had the power to hire and fire the employees; 2) supervised and controlled the employees' work schedules or conditions of employment; 3) determined the rate and method of payment; and 4) maintained employment records. *Villareal v. Woodham*, 113 F.3d 202, 205 (11th Cir. 1997). Further, corporate officers with "significant operational control of a corporation's day-to-day operations, including compensation of employees," are employers within the meaning of the FLSA. *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986). The Eleventh Circuit has further stated: "To be personally liable, an officer must be either involved

-12-

in the day-to-day operation or have some direct responsibility for the supervision of the employee."
*Id.*

      C.     *Individual Coverage: Employee Engaged in Commerce*

      Under the FLSA, an employer is required to pay overtime compensation if the employee can establish "enterprise coverage" or "individual coverage."   29 U.S.C. § 203(b), (s); *Thorne v. All Restoration Svcs., Inc.*, 448 F.3d 1264, 1265-66 (11th Cir. 2006).  The FLSA defines an "enterprise engaged in commerce" as an enterprise with annual gross revenue of $500,000 or greater. 29 U.S.C. § 203(s); *Chao v. A-One Medical Services, Inc.*, 346 F.3d 908, 914 (9th Cir. 2003).   Coes concedes that Williams and World Wide Express do not meet the requirements for "enterprise coverage." Docket No. 61 at 5.

      Therefore, for "individual coverage" to apply under FLSA, Coes must prove that she was: 1) engaged in commerce or 2) engaged in the production of goods for commerce.   29 U.S.C. §§ 206(a)(1), 207(a)(1).  Coes argues that she qualifies for individual coverage under the FLSA because as part of her employment she was "engaged in commerce."  The work of employees "engaged in commerce" involves or relates to "the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." 29 C.F.R. § 776.9 (quotation omitted).  According to the United States Supreme Court, Congress did not intend for the scope of the FLSA to be coextensive with Congress' power to regulate commerce. *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959).  Instead, Congress intended to regulate only activities constituting interstate commerce, not activities merely *affecting* commerce. *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943).

      According to the Eleventh Circuit, for an employee to be "engaged in commerce" under the FLSA:

> [H]e must be directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel.

*Thorne*, 448 F.3d at 1266 (citing 29 C.F.R. § 776.23(d)(2), 29 C.F.R. § 776.24, and *McLeod*, 319 U.S. at 493-98).  29 C.F.R. § 776.10(b) provides further guidance, stating that:

> [S]ince "commerce" as used in the Act includes not only "transmission" of communications but "communication" itself, employees whose work involves the continued use of the interstate mails, telegraph, telephone or similar instrumentalities for communication across State lines are covered by the Act.  This does not mean that any use by an employee of the mails and other channels of communication is sufficient to establish coverage.  But if the employee, as a regular and recurrent part of his duties, uses such instrumentalities in obtaining or communicating information or in sending or receiving written reports or messages, or orders for goods or services, or plans or other documents across State lines, he comes within the scope of the Act as an employee directly engaged in the work of "communication" between the State and places outside the State.

29 C.F.R. § 776.10(b) (citations omitted).  Plaintiff was "engaged in commerce" because, as part of her work, she regularly arranged bus trips to travel outside of Florida, and in doing so, communicated by telephone and by facsimile with those individuals in other states. R. 32-33; Doc. No. 61 at 5-6.

### D. *Unpaid and Overtime Wages*

The employee bringing suit for unpaid or overtime wages under the FLSA has the burden of proving that she performed work for which she was not properly compensated.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  FLSA and its implementing regulations require an employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by [the employer]." 29 U.S.C. § 211(c). Although employees seeking to recover overtime or unpaid wages under FLSA have the burden of proving that they worked without proper compensation, "[t]he remedial nature of this statute and the great public policy which it embodies . . . militate against making that burden an

-14-

impossible hurdle for the employee." *Allen v. Board of Public Educ. for Bibb County*, __ F.3d __, 2007 WL 2332506, *6 (11th Cir. Aug. 17, 2007) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). However, it is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment because the employer is in a superior position to know and produce the most probative facts concerning the nature and amount of work performed and "[e]mployees seldom keep such records themselves." *Allen*, 2007 WL 2332506 at *6 (citing *Anderson*, 328 U.S. at 687).

If an employer fails to maintain records concerning the employee's wages, hours, and other terms and conditions of employment as required by FLSA and the employee cannot offer convincing substitutes,

> "[t]he solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act." *Id.* Thus in situations where the employer's records cannot be trusted and the employee lacks documentation, the Supreme Court held "that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* The burden then becomes the employer's, and it must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Id.* at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

*Allen*, 2007 WL 2332506 at *7 (quoting *Anderson*, 328 U.S. at 687-88).

The employer is liable for compensating an employee for all hours that the employer "suffer[s] or permit[s] [the employee] to work." 29 U.S.C. §203(g). A rule against compensating for unauthorized overtime is not enough to avoid liability where the employer knows of the hours worked and takes no action to enforce its rules. *See Reich v. Dep't of Conservation & Natural Res., State of*

-15-

*Ala.*, 28 F.3d 1076 (11th Cir. 1994).  If the employer violates either the minimum wage or overtime provisions of the FLSA, the employer is liable for the unpaid amounts, and an additional equal amount as liquidated damages.  29 U.S.C. § 216(b).

E.    *Willful Violation and Liquidated Damages*

Plaintiff filed suit in April 2005, seeking unpaid wages and overtime for work performed since February 2002, or more than three years prior.  The FLSA's statute of limitations provides that a claim for unpaid wages which is not commenced "within two years after the cause of action accrued . . . shall be forever barred . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a); *see Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 469 F.Supp.2d 1086, 1092-93 (M.D. Fla. 2006).  An employer's violation of the FLSA is willful if it "either knew or showed a reckless disregard for the matter of whether its conduct was prohibited by the statute."  *Id.* at 1093 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).  Plaintiff is limited to recovering damages only from April 2002 to April 2005.  Defendants' willful violation of the FLSA is supported by Defendants' lack of records, tax forms, or research regarding responsibilities to his employee.

An employer who seeks to avoid liquidated damages bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict." *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987); *Miller v. Paradise of Port Richey, Inc.,* 75 F.Supp.2d 1342, 1344 (M.D. Fla. 1999) (the law is well settled in the Eleventh Circuit that a prevailing plaintiff is entitled to a mandatory award of liquidated damages unless the district court explicitly finds that the defendant acted in good faith in violating the Fair Labor Standards Act).  An employer, who knew or had reason to know that the FLSA applied, cannot establish good faith as a defense. *Joiner*, 814 F.2d at 1539 (citing *Reeves,*

-16-

616 F.2d at 1352-53).  Liquidated damages are mandatory absent a showing of good faith.  *Joiner*, 814 F.2d at 1539 (citing *EEOC v. First Citizens Bank of Billings,* 758 F.2d 397, 403 (9th Cir. 1985)).

Based on the testimony at trial, Williams failed to show that he acted in good faith and with reasonable grounds to believe that Defendants were not subject to the overtime provisions of the FLSA.  Williams testified that he never researched the overtime provisions of the law before hiring employees.   The evidence presented at trial demonstrates that Defendants acted recklessly and without regard to Plaintiff's rights under the FLSA; thus, Plaintiff is entitled to liquidated damages in an amount equal to the overtime owed.

### F.    Calculation of Damages

In this case, precisely calculating Plaintiff's damages is difficult, because Defendants have failed to maintain accurate and comprehensive records of Plaintiff's employment.  Thus, because Defendants' records "cannot be trusted" and Plaintiff lacks documentation, it is Plaintiff's burden to prove that she has "in fact performed work for which [she] was improperly compensated" and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Allen*, 2007 WL 2332506 at *7 (quoting *Anderson*, 328 U.S. at 687-88).

Plaintiff has only partially met her burden to prove that she "in fact performed work."  She has produced "sufficient evidence" to show she worked on a regular full-time basis for Defendants; however, she has not produced evidence that she worked overtime as she alleges as a matter of a "just and reasonable inference."  *Allen*, 2007 WL 2332506 at *7 (quoting *Anderson*, 328 U.S. at 687-88).  Plaintiff has not overcome Defendants' evidence that she went to work for him full-time instead of DCF because it was more convenient and, by working from home, she could also care for her granddaughter in her home.  R. 114, 130.  Although there was evidence that Plaintiff worked a daily schedule, there was little credible evidence of any overtime hours, the number of breaks she took (R.

-17-

75), or how much time she spent caring for her granddaughter while waiting for Williams to call. *See* R. 114, 130.

The best evidence of Plaintiff's expected compensation was her testimony that her agreed-upon salary was to be $500 per month and she was willing to exchange her work for Williams' construction services in converting her garage. *See Anderson*, 328 U.S. at 688 ("the court may award damages to the employee, even though the result be only approximate"). Plaintiff testified that in February 2003, Williams agreed to pay her $500 per month for full-time work. R. 47. Extrapolating Plaintiff's monthly salary to an annual amount results in $6,000 per year, or $115.88 per week, or $2.90 per hour. Plaintiff also testified that as of summer 2003, she was willing to work for one year in exchange for Williams' conversion of her garage. Although Williams did not complete the conversion of her garage, the value of his services can be gleaned from the cost for others to complete it, which totaled $7,300, or $140 per week, or $3.51 per hour. Both of these resulting hourly rates results in a rate below minimum wage when a 40-hour full-time week is applied. The FLSA does not prevent employers from setting pay scales for covered workers in periodic terms other than per-hour, however, the resulting hourly pay rate must not fall below the FLSA-prescribed minimum wage. *Hunter v. Sprint Corp.*, 453 F.Supp.2d 44, 55 (D.D.C. 2006). The minimum wage was $5.15 during the period[14] in question.

Based on the Court's findings of fact and conclusions of law, the Court awards damages to Plaintiff for full-time work, but at the prevailing minimum wage, as follows:

| Time Period | Number of Weeks | # of Hours Per Week | Minimum Wage Rate | Total Regular Wages Owed | Total Liquid. Damages | **TOTAL** |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

---

[14]The minimum wage was $5.15 from September 1, 1997 until July 24, 2007. *See* www.dol.gov/esa/minwage/chart.htm.

| 4/02-2/03 | 40 | 20[15] | 5.15 | 4,120 | 4,120 | 8,240 |
| 2/03-12/04 | 96 | 40 | 5.15 | 19,776 | 19,776 | 39,552 |
| TOTALS | 148 | | | | | **$47,792** |

# CONCLUSION

Based on the testimony at trial and the other evidence presented, the Court renders a verdict in favor of Plaintiff for $47,792 against Defendants jointly and severally.  The Clerk of the Court is directed to enter judgment consistent with this opinion (awarding Plaintiffs costs of the action)  and, thereafter, to close the file.  The Court retains jurisdiction to award attorneys fees.  Plaintiffs may move for an award of fees within 14 days of the entry of judgment and shall comply with Local Rule 3.01(g) as to any such motion.

**DONE** and **ORDERED** in Orlando, Florida on September 26, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

---

[15]Plaintiff worked part-time at DCF during the time period.  R. 47.

-19-